Slip Op. 16 - 14

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HEBEI JIHENG CHEMICALS CO., LTD., <br><br>                Plaintiff, <br><br>        v. <br><br> UNITED STATES, <br><br>                Defendant. | Before: Donald C. Pogue, Senior Judge <br><br> Court No. 14-00337 |

OPINION

[final countervailing duty determination affirmed]

Dated: February 18, 2016

        Lizbeth R. Levinson and Ronald M. Wisla, Kutak Rock LLP, of Washington, DC, for Plaintiff, Hebei Jiheng Chemicals Co., Ltd.

        David F. D'Alessandris, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the Defendant. With him on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel was Lisa W. Wang, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

        James R. Cannon, Jr. and Ulrika K. Swanson, Cassidy Levy Kent (USA), LLP, of Washington, DC, for Defendant-Intervenors Clearon Corp. and Occidental Chemical Corp.

        **Pogue, Senior Judge:** In this action, Plaintiff Hebei

Jiheng Chemicals Co., Ltd. ("Jiheng") challenges the final

determination of the U.S. Department of Commerce ("Commerce") in

the countervailing duty ("CVD") investigation of chlorinated

isocyanurates from the People's Republic of China ("PRC").[1]

Plaintiff challenges Commerce's determination, claiming that

Commerce misread the record regarding preferential electricity

rates provided to the Plaintiff by the Government of China

("GOC"), and thereby "vastly overstated the calculated net

benefit" conferred on Plaintiff and impermissibly applied

adverse facts available ("AFA") to Plaintiff, a cooperating

respondent.[2]

Because Commerce's benefit calculation was based on a

reasonable reading of the record evidence, its decision is

supported by substantial evidence.  Because Commerce's

---

[1] Compl., ECF No. 7, at ¶¶ 1-2; see Chlorinated Isocyanurates from the [PRC], 79 Fed. Reg. 56,560 (Dep't Commerce Sept. 22, 2014) (final affirmative countervailing duty determination; 2012) ("Final Determination") and accompanying Issues & Decision Mem., C-570-991, Investigation (Sept. 8, 2014) ("Final I&D Mem."). Jiheng is "a Chinese producer and exporter to the United States of subject chlorinated isocyanurates." Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on the Agency R., ECF No. 25-2 ("Pl.'s Br."), at 1.  Chlorinated isocyanurates, as defined by the scope of the Final Determination, are "derivatives of cyanuric acid, described as chlorinated s-triazine triones," the "three primary chemical compositions of chlorinated isocyanurates" being "(1) Trichloroisocyanuric acid ('TCCA') $(Cl_3(NCO)_3)$, (2) sodium dichloroisocyanurate (dihydrate) [('SDIC')] $(NaCl_2(NCO)_3 X 2H_2O)$, and (3) sodium dichloroisocyanurate (anhydrous) $(NaCl_2(NCO)_3)$." Final Determination, 79 Fed. Reg. at 56,561.

[2] Pl.'s Br., ECF No. 25-2, at 5-15.  The court has jurisdiction pursuant to § 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012) and 28 U.S.C. § 1581(c) (2012). All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2012 edition.

application of AFA to the GOC, and the collateral impact of that

decision on Plaintiff, is reasonably within the agency's

discretion, its decision is in accordance with law.  The court,

accordingly, affirms.


**BACKGROUND**


In the administrative proceeding challenged here,

Commerce initiated a CVD investigation, following a petition

filed by Defendant-Intervenors,[3] to determine whether producers

and exporters of chlorinated isocyanurates in the PRC had

received countervailable subsidies within the meaning of

19 U.S.C. §§ 1671, 1677(5).[4]  Commerce selected Plaintiff as one

of two mandatory respondents.[5]

---

[3] Clearon Corp. and Occidental Chemical Corp. are domestic
producers of chlorinated isocyanurates. Chlorinated
Isocyanurates from the [PRC], 78 Fed. Reg. 59,001, 59,001 (Dep't
Commerce Sept. 25, 2013) (initiation of countervailing duty
investigation) ("CVD Initiation").

[4] CVD Initiation, 78 Fed. Reg. at 59,001.  Commerce will impose a
countervailing duty on an import whenever it determines that
"the government of a country . . . is providing, directly or
indirectly, a countervailable subsidy with respect to the
manufacture, production, or export of a class or kind of
merchandise imported, or sold (or likely to be sold) for
importation, into the United States." 19 U.S.C. § 1671(a)(1).
The International Trade Commission must also find that "an
industry in the United States" is "materially injured" or
"threatened with material injury," by the importation of those
imports. Id. at § 1671(a)(2).  The International Trade
Commission's determination is not at issue in this case.  A
subsidy is countervailable when it provides a "financial
contribution" to a "specific" industry, and "a benefit is
thereby conferred" upon the respondent. Id. at §§ 1677(5), (5A).
                                        (footnote continued)

To investigate the Petitioner's allegation that the

GOC had subsidized respondents' electricity costs, Commerce sent

initial and supplemental questionnaires to the GOC and mandatory

respondents.[6]  While respondents' filings were responsive,[7] the

---

A benefit is conferred upon a respondent when "goods or services," such as electricity, "are provided for less than adequate remuneration." Id. at § 1677(5)(E)(iv).  Ideally, the "adequacy of remuneration" is measured by "comparing the government price," the price paid by the respondent, "to a market-determined price for the good or service resulting from actual transactions in the country in question," the benchmark price. 19 C.F.R. § 351.511(a)(2)(i) (2012).

[5] Chlorinated Isocyanurates from the [PRC], 79 Fed. Reg. 10,097, 10,098 (Dep't Commerce Feb. 24, 2014) (preliminary determination and alignment of final determination with final antidumping determination) and accompanying Issues & Decisions Mem., C—570-991, Investigation (Feb. 11, 2014) ("Prelim. I&D Mem.") at 3 (selecting Plaintiff and Juancheng Kangtai Chemical Co., Ltd., as mandatory respondents based on their status as the largest, by volume, producers/exporters of chlorinated isocyanurates from the PRC to the United States during the period of investigation); see 19 U.S.C. § 1677f-1(e)(2)(A)(ii) ("If the administering authority determines that it is not practicable to determine individual countervailable subsidy rates [for each known exporter or producer of subject merchandise] because of the large number of exporters or producers involved in the investigation or review, the administering authority may . . . determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to . . . exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the administering authority determines can be reasonably examined."); 19 C.F.R. § 351.204(c) ("[Commerce] may limit the investigation using [the] method described in [19 U.S.C. § 1677f-1(e)(2)(A)(ii)]").

[6] Prelim. I&D Mem., supra note 5, at 1-2. To determine whether there is a countervailable subsidy, "Commerce often requires information from the foreign government allegedly providing [that] subsidy." Fine Furniture (Shanghai) Ltd. v. United States, 748 F.3d 1365, 1369-70 (Fed. Cir. 2014); see Final I&D

(footnote continued)

GOC did not provide, in either questionnaire, requested
province-specific information on its electricity pricing
practices.[8]  "[N]ecessary information regarding the GOC's
provision of electricity [was therefore] not on the record."[9]
Consequently, Commerce had to "rely on facts otherwise
available," pursuant to 19 U.S.C. § 1677e(a) to evaluate the
GOC's electricity pricing practices.[10]  Further, Commerce found
that "the GOC [had] failed to cooperate by not acting to the
best of its ability," and determined that "an adverse inference
was warranted in its application of the facts available"
provision, pursuant to 19 U.S.C. § 1677e(b).[11]

        Drawing adverse inferences regarding the facts
available, Commerce determined that the GOC's provision of
electricity was "a financial contribution within the meaning of
[19 U.S.C. § 1677(5)(D)] and [was] specific within the meaning

---

Mem., *supra* note 1, at 21 ("In a CVD case, [Commerce] requires
information from both the government of the country whose
merchandise is under investigation and the foreign producers and
exporters.").

[7] Final I&D Mem., *supra* note 1, at 21.

[8] Final Determination, 79 Fed. Reg. at 56,561; Final I&D Mem.,
*supra* note 1, at 9.

[9] Final Determination, 79 Fed. Reg. at 56,561.

[10] Id.

[11] Id.

of [19 U.S.C. § 1677(5A)]."[12]   These determinations are

uncontested here.[13]   Commerce also used adverse facts available

when it selected the benchmark rates used to calculate the

benefit conferred on the respondents.[14]   Specifically, for the

benchmark Commerce selected the highest electricity rates on the

record for the respondents' rate and user categories, the large

industry rate schedule for Zhejiang province.[15]   "To calculate

the benefit," Commerce "subtracted the amount paid by the

respondents for electricity"[16] from the "benchmark electricity

---

[12] Id.

[13] Pl.'s Br., ECF No. 25-2, at 5 ("Jiheng does not dispute
Commerce's application of [AFA] with respect to the provision of
electricity for [less than adequate remuneration].").

[14] Final Determination, 79 Fed. Reg. at 56,561; Final I&D Mem.,
supra note 1, at 21 ("This benchmark reflects an adverse
inference, which [Commerce] drew as a result of the GOC's
failure to act to the best of its ability in providing requested
information about its provision of electricity in this
investigation.").

[15] Final I&D Mem., supra note 1, at 10, 21, 30; Prelim. Benchmark
Mem., Chlorinated Isocyanurates from the [PRC], C-570-991,
Investigation (Feb. 11, 2014) (adopted in Final Determination,
79 Fed. Reg. at 56,561; Final I&D Mem., supra note 1, at 10)
("Prelim. Benchmark Mem.") at 1, attach. 1 (electricity
benchmark table), reproduced in Def.'s App. in Supp. of Mem. in
Opp'n to [Pl.'s Br.], ECF No. 30-1 ("Def.'s App.") at Tab 4;
see also GOC's Initial Questionnaire Resp., Chlorinated
Isocyanurates from the [PRC], C-570-991, Investigation (Dec. 20,
2013) at Ex. E2-3 (Electricity Sales Schedule of Zhejiang Grid),
reproduced in Def.'s App., ECF No. 30-1 at Tab 2 ("Zhejiang
Electricity Schedule").

[16] Commerce "relied on [respondents] records" to "the extent that
[they were] usable and verifiable," to determine what the
                                              (footnote continued)

price."[17]  Commerce accordingly determined that "subsidies [had]

been provided to producers and exporters of chlorinated

isocyanurates . . . in the [PRC],"[18] and that Jiheng's total

estimated countervailable subsidy rate was 20.06 percent.[19]

Plaintiff challenges this determination as unsupported

by substantial evidence and not in accordance with law, first

alleging that Commerce "misinterpreted the . . . [Zhejiang]

electricity schedule" as a three-tier rather than four-tier

pricing system,[20] and second claiming Commerce incorrectly

selected "large industry" rates rather than rates "specific to

---

respondents actually paid for electricity. Final I&D Mem., *supra*
note 1, at 21.  Commerce found that Hebei Jiheng Group Co., Ltd.
("Jiheng Group"), "a holding company and majority shareholder of
Jiheng, which provides raw materials (sulfuric acid and steam)
to Jiheng and other affiliated companies," Prelim. I&D Mem.,
*supra* note 5, at 5, was found to have "failed to report its
electricity purchases for one of its branch companies," such
that "necessary information regarding [its] electricity
purchases [were] not on the record," and Commerce had to "rely
on facts otherwise available in this final determination in
calculating the Jiheng Group's CVD rate," Final Determination,
79 Fed. Reg. at 56,561 (citing 19 U.S.C. § 1677e(a)).  Commerce
further found that "Jiheng Group failed to cooperate by not
acting to the best of its ability and, consequently, an adverse
inference is warranted in the application of facts available."
Id. (citing 19 U.S.C. § 1677e(b)).

[17] Final I&D Mem., *supra* note 1, at 22. From this benefit,
Commerce calculated the respondents' respective countervailable
subsidy rates. Id.

[18] Id. at 1; Final Determination, 79 Fed. Reg. at 56,560.

[19] Final Determination, 79 Fed. Reg. at 56,562.

[20] Pl.'s Br., ECF No. 25-2, at 6; see generally id. at 5-11.

chlor-alkali producers."[21]  Plaintiff argues that, in so doing,

Commerce incorrectly benchmarked respondents' electricity rates,

thereby "vastly overstat[ing] the calculated net benefit" to the

Plaintiff[22] and "effectively appli[ng] an adverse inference to

[Plaintiff], over and above applying the intended adverse

inference to the GOC."[23]  Defendant and Defendant-Intervenors

counter that Commerce's determination was supported by

substantial evidence and in accordance with law because

Commerce's benchmark selection was based on a reasonable reading

of the record evidence and Plaintiff was not impermissibly

affected by the application of adverse inferences to the GOC.[24]

## STANDARD OF REVIEW

The court will sustain Commerce's determination unless

it is "unsupported by substantial evidence on the record, or

otherwise not in accordance with law."[25]

Substantial evidence review requires consideration of

"the record as a whole, including any evidence that fairly

---

[21] Id. at 12; see generally id. at 11-15.

[22] Id. at 10, 12.

[23] Id. at 10, 14-15.

[24] Def.'s Mem. in Opp'n to [Pl.'s Br.], ECF No. 30; Resp. Br. of Clearon Corp. & Occidental Chem. Corp., ECF No. 31.

[25] 19 U.S.C. § 1516a(b)(1)(B)(i).

detracts from the substantiality of the evidence,"[26] and asks, in light of that evidence, whether Commerce's determination was reasonable.[27]

As relevant here, review for "accordance with law," asks, where "Congress directly spoke to the precise question at issue and clearly expressed its purpose and intent in the governing statute," whether the agency's determination is in accordance with that statute; or, if Congress has not spoken directly on the issue, "the agency's interpretation" is "a reasonable construction of the statute."[28]

## DISCUSSION

To calculate the benefit conferred by a countervailable subsidy, Commerce compares a benchmark price to the price actually paid by the respondent.[29]  Here, drawing an adverse inference against the GOC, Commerce selected, from the

---

[26] Gallant Ocean (Thailand) Co. v. United States, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (internal quotation marks and citation omitted).

[27] Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

[28] Yangzhou  Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1377 (Fed. Cir. 2013) (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1984)).

[29] 19 U.S.C. § 1677(5)(E); 19 C.F.R. § 351.511(a)(2)(i); see Fine Furniture, 748 F.3d at 1370.

facts available on the record, the large industry rates from Zhejiang province for the benchmark, because those rates were the "highest electricity rates on [the] record" for the "applicable rate and user categories."[30]  Because respondents were cooperative, Commerce relied on the respondent's own records, "to the extent [they were] usable and verifiable," to determine their actual electricity consumption and rates paid.[31]

In comparing the two sets of rates, Commerce determined that the Zhejiang province electricity schedule was a three-tier pricing system, with rates varying by time of usage.[32] Jiheng reported its electricity consumption and rates based on

---

[30] Final I&D Mem., supra note 1, at 10; Prelim. Benchmark Mem., ECF No. 30-1 at Tab 4, at 1, attach. 1 (electricity benchmark table); Zhejiang Electricity Schedule, ECF No. 30-1 at Tab 2 at Ex. E2-3.

[31] See Final I&D Mem., supra note 1, at 21 (citation omitted).

[32] Final I&D Mem., supra note 1, at 30-31; Prelim. Benchmark Mem., ECF No. 30-1 at Tab 4, at attach. 1 (electricity benchmark table).  That is, the Zhejiang Electricity Schedule provides (1) "Sharp Price" (also translated as "Critical Peak," charged from 19:00 to 21:00 each day); (2) "Peak Price" (charged from 08:00 to 11:00, 13:00 to 19:00, and 21:00-22:00 each day); and (3) "Off-Peak Price" (also translated as "Valley," charged from 11:00 to 13:00 and 22:00 to 08:00 the following day). Zhejiang Electricity Schedule, ECF No. 30-1 at Tab 2 at Ex. E2-3. Commerce, "[b]ased on past practice, and [its] understanding of the PRC's multi-tiered electricity system," has "consistently interpreted these labels, including slightly varied translations thereof, to be a three-tiered 'valley, normal, and peak' rate structure and selected the highest rates from the 'sharp' category for the 'peak' benchmark rate." Final I&D Mem., supra note 1, at 31 (footnote and citations omitted).

the Southern Hebei electricity schedule, which has a four-tier
pricing system.[33]  To adjust for this difference, Commerce
aligned the lowest rate from Zhejiang ("Off Peak") with the
lowest rate from Southern Hebei ("Valley"), the next highest
rate in Zhejiang ("Peak") with the next highest rate in Southern
Hebei ("Normal"), and the highest rate in Zhejiang ("Sharp")
with the next highest rate in Southern Hebei ("Peak").[34]  Then,
lacking a fourth Zhejiang rate, Commerce used the actual
Southern Hebei "High Peak" for the benchmark.[35]

I.   The Zhejiang "Four-Tier" Electricity Schedule

        Plaintiff first argues that Commerce's determination
is incorrect because the agency "misinterpreted the Zhejiang

---

[33] That is: (1) "High Peak"; (2) "Peak"; (3) "Normal"; and
(4) "Valley." GOC's Initial Questionnaire Resp., Chlorinated
Isocyanurates from the [PRC], C-570-991, Investigation (Dec. 20,
2013) at Ex. E2-3 (Electricity Sales Schedule of Southern Hebei
Power Grid), reproduced in [Pl.'s] App., ECF Nos. 26 (conf.
ver.) & 27 (pub. ver.) at Tab 4; Section III Resp. of [Jiheng],
Chlorinated Isocyanurates from the [PRC], C-570-991,
Investigation (Dec. 23, 2013), reproduced in [Pl.'s] App., ECF
Nos. 26 & 27 at Tab 3 ("Jiheng Section III Resp.") at app. 26
(Electricity Template of Hebei Jiheng) ("Jiheng Electricity
Template") (reporting Jiheng's electricity consumption on the
Southern Hebei four-tier schedule with high peak, peak, normal,
and valley).

[34] See Prelim. Benchmark Mem., ECF No. 30-1 at Tab 4, at
attach. 1; Final I&D Mem., supra note 1, at 30-31.

[35] See Prelim. Benchmark Mem., ECF No. 30-1 at Tab 4, at
attach. 1 (providing the "S[outhern] Hebei" rate as the
benchmark for each of the "High Peak" rates).

electricity schedule" as a three-tier rather than four-tier pricing system and thereby "vastly overstated the net benefit attributable" to Plaintiff.[36]  Plaintiff claims that "Commerce totally ignored" the presence of the "KWH Electricity Tariff" in the Zhejiang electricity schedule.[37]  Plaintiff asserts that the KWH Electricity Tariff "corresponds to the 'Normal' price category in the Southern Hebei electricity schedule" because it applies in Zhejiang "when the three time-period rates [are] not [otherwise] applicable."[38]  This, according to Plaintiff, proves that "the Zhejiang schedule, just like the Southern Hebei schedule, was, i[n] fact, a four-tiered price system."[39]

Commerce did not, however, "totally ignore" the Zhejiang KWH Electricity Tariff, but rather, considering the record evidence and reasonable inferences therefrom,[40] expressly declined to adopt Plaintiff's interpretation of the Zhejiang rate schedule.  Commerce found "no basis to assume that the KWH

---

[36] Pl.'s Br., ECF No. 25-2, at 6, 10; see generally id. at 5-11.

[37] Id. at 6.

[38] Id.

[39] Id.

[40] See Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984) ("More specifically, [under the substantial evidence standard] the question . . . is whether the evidence and reasonable inferences from the record support [Commerce's finding].").

Electricity Tariff would be representative of a normal rate."[41]
Indeed, as Commerce points out, the Zhejiang rate schedule
provides no explanation or definition of what the KWH
Electricity Tariff is or when it applies.[42]  Further, the three-
tier schedule, not including the KWH Electricity Tariff, covers
all 24 hours of the day.[43]

        Plaintiff's attempt at defining the KWH Electricity
Tariff brings much heat but no light to the issue.  Plaintiff
makes various conclusory statements,[44] argumentative

_____

[41] Final I&D Mem., *supra* note 1, at 31.

[42] See Zhejiang Electricity Schedule, ECF No. 30-1 at Tab 2 at
Ex. E2-3; Final I&D Mem., *supra* note 1, at 31 (noting that the
"record is silent as to what the KWH Electricity Tariff
represents" and that it is "unclear as to what time period the
KWH Electricity Tariff covers," leaving Commerce "no basis to
assume that the KWH Electricity Tariff would be representative
of a normal rate").

[43] See Zhejiang Electricity Schedule, ECF No. 30-1 at Tab 2 at
Ex. E2-3; Final I&D Mem., *supra* note 1, at 31.

[44] Plaintiff claims that the Zhejiang KWH Electricity Tariff is
used "when the three time-period rates [on the Zhejiang
schedule] [are] not applicable." Pl.'s Br., ECF No. 25-2, at 6.
From this, Plaintiff concludes that "the Zhejiang schedule, just
like the Southern Hebei schedule, [is], i[n] fact, a four-tiered
price system." Id.  "In fact" is a curious choice of words,
given that Plaintiff offers no evidence on the record to support
this position.  Plaintiff offers only a re-reading of the
Zhejiang schedule that is more to its liking.  Plaintiff
believes that the "Zhejiang schedule clearly provides four
tariff rates" because the KWH Electricity Tariff "is placed in a
column right next to the prices of Sharp, Peak and Off-Peak
tariff rates," id. at 8 (citation omitted), its use as the
benchmark for "normal" would present a better numerical
progression, id. at 7-8, and it is the "only tariff rate
                                        (footnote continued)

pronouncements,[45] and declarations of irrelevant facts.[46]  As

such, Plaintiff accomplishes the ironic effect of supporting not

---

applicable" to some types of users, id. at 9.  "Necessarily,"
Plaintiff says, "the [Zhejiang] KWH Electricity Tariff . . . is
applicable in all cases where the other three rates are not
applicable." Id. at 8.  But there is nothing necessary about
this conclusion.  The Zhejiang electricity rate schedule does
not define the "KWH Electricity Tariff," See Zhejiang
Electricity Schedule, ECF No. 30-1 at Tab 2 at Ex. E2-3, and
Plaintiff points to nothing on the record to suggest that it
applies as a "normal rate" to users in Zhejiang province.
Plaintiff only provides an alternative, unsubstantiated
interpretation.  This is not enough for this Court to remand to
Commerce.  "[T]he possibility of drawing two inconsistent
conclusions from the evidence does not prevent an administrative
agency's finding from being supported by substantial evidence."
Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966) (citations
omitted).

[45] Plaintiff argues that Commerce's statement that "'there is no
evidence [on the record to demonstrate] that [this] is a higher
rate than "peak,"'" Pl.'s Br., ECF No. 25-2, at 8 (misquoting
Final I&D Mem., supra note 1, at 31), is "preposterous," because
"Commerce's own benchmark includes a 'High Peak' category" and
"the Southern Hebei electricity schedule . . . contains a 'sharp
peak' or 'high peak' rate that is higher than the 'peak' rate,"
id.  However, Commerce's statement is only "preposterous" when
quoted out of context, as Plaintiff's counsel has done.
Commerce was not discussing the Southern Hebei schedule or even
its benchmarks in this investigation, but rather its practice of
using a three-tier benchmark pricing schedule, with "peak" being
the generic label for the highest rate, regardless of the
vagaries of translation. Final I&D Mem., supra note 1 at 31
("Based on past practice, and [Commerce's] understanding of the
PRC's multi-tiered electricity system, [Commerce has]
consistently interpreted [the Zhejiang labels of 'sharp, peak,
and off-peak' or 'critical peak, peak, and valley'], including
slightly varied translations thereof, to be a three-tiered
'valley, normal, and peak' rate structure and selected the
highest rates from the 'sharp' category for the 'peak' benchmark
rate.  Moreover, we note that apart from the reference to a
'critical peak' period, there is no evidence on the record to
demonstrate that this is a higher rate than 'peak.'") (footnote
(footnote continued)

its own position but Commerce's determination that "the record

is silent as to what the KWH Electricity Tariff represents."[47]

Commerce's determination is not rendered "mistaken"[48]

"faulty,"[49] "untenable,"[50] "preposterous,"[51], or "nonsensical,"[52]

simply because Plaintiff's counsel says it is.  If Plaintiff

thought Commerce's three-tier interpretation incorrect, it

should have developed the administrative record with information

---

and citations omitted).

[46] Plaintiff asserts that its "reported electricity consumptions
under the 'Normal' tariff rate of the Southern Hebei electricity
schedule . . . is approximately equal to the monthly electricity
consumptions reported under the Peak and Valley tariff rates,
and is several time[s] larger than the monthly electricity
consumptions under the Sharp tariff rate." Pl.'s Br., ECF No.
25-2, at 9 (citations omitted). "Accordingly," Plaintiff's
counsel asserts, "consumption under the [Zhejiang] KWH
electricity Tariff should similarly be expected." Id.
Plaintiff's counsel would have the court infer that, based on
Jiheng's own consumption under the Southern Hebei schedule, the
"KWH Electricity Tariff under the Zhejiang electricity schedule
is a separate rate whose application is not limited by any time
period . . . [and] used in instances when [the] Sharp[,] Peak
and Off Peak tariffs are present, but not applicable." Id.  This
is a *non sequitur*.  Plaintiff's own consumption under the
Southern Hebei schedule has no bearing on what the Zhejiang KWH
Electricity Tariff is or when it applies.  It is irrelevant.

[47] Final I&D Mem., *supra* note 1, at 31.

[48] Pl.'s Br., ECF No. 25-2, at 6.

[49] Id. at 7.

[50] Id.

[51] Id. at 8.

[52] Id. at 8, 9.

supporting its own four-tier interpretation.[53]  More importantly, the question for this Court is whether Commerce's determination is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,"[54] not whether Plaintiff can provide some argument for a preferred rate.[55] Because Commerce has articulated a reasonable and rational connection between the facts on the record and the choices the agency has made, its reading of the Zhejiang electricity pricing schedule is supported by substantial evidence.[56]

---

[53] QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("[T]he burden of creating an adequate record lies with [interested parties] and not with Commerce.") (second alteration original, quotation marks and citations omitted); US Magnesium LLC v. United States, __ CIT __, 70 F. Supp. 3d 1321, 1328 (2015) ("If [Plaintiff] believed [that Commerce made] a poor choice, [Plaintiff] should have developed the administrative record with information substantiating its inference . . . .") (citation omitted).

[54] Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

[55] See Consolo, 383 U.S. at 620; Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Tech., Salaried & Mach. Workers, AFL-CIO, 6 F.3d 1511, 1520 (Fed. Cir. 1993) ("[Under the substantial evidence standard], [t]he question is whether the record adequately supports the decision of the [agency], not whether some other inference could reasonably have been drawn.").

[56] Cf. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962) (finding an agency determination unsupported by substantial evidence because the agency did not "articulate any rational connection between the facts found and the choice made").

## II.  The Zhejiang Schedule "Large Industry" v. "Large Industry (Chlor-Alkali)" Rates

Second, Plaintiff argues that Commerce's use of the Zhejiang rates for large industry, rather than the (lower) Zhejiang rates for "the production of chlor-alkali products," resulted in a calculation that "vastly overstated the net benefit" to Plaintiff,[57] and thereby made the application of AFA "excessive" and "contrary to Commerce's stated intention of limiting [the application of adverse facts] to the GOC."[58]

Commerce, however, has broad "discretion to choose which sources and facts it will rely on to support an adverse inference when a respondent has been shown to be uncooperative."[59]  The statute is unambiguous on this point.[60]  In applying adverse inferences Commerce is authorized to look to "any . . . information placed on the record," to fill the gaps in its data,[61] so long as Commerce's determination remains in

---

[57] Pl.'s Br., ECF No. 25-2, at 12; Reply Br. of [Jiheng], ECF No. 36 ("Pl.'s Reply"), at 11-16.

[58] Pl.'s Br., ECF No. 25-2, at 15; Pl.'s Reply, ECF No. 36, at 16-17.

[59] See F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

[60] See Nan Ya Plastics Corp. v. United States, No. 2015-1054, 2016 WL 209915, at *8-9 (Fed. Cir. Jan. 19, 2016).

[61] 19 U.S.C. § 1677e(b)(4).

accordance with law and reasonable in light of the record evidence.[62]

Here, Commerce's application of adverse inferences is in accordance with law because it is "consistent with the method provided in the statute."[63]  Specifically, an adverse inference in a CVD investigation may have "a collateral impact on a cooperating party," without being rendered "improper."[64]  Where, as here, an adverse inference made against the GOC "collaterally reaches" a cooperating company that is "within the [PRC], benefitting directly from subsidies the [GOC] may be providing," then the adverse inference is permissible, because it "has the

---

[62] See Nan Ya, 2016 WL 209915, at *7 (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).  Commerce's application of adverse inferences must be reasonably accurate, see Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States, 753 F.3d 1227, 1234 (Fed. Cir. 2014), and tied to "commercial reality," Gallant Ocean, 602 F.3d at 1323.  But, contrary to Plaintiff's understanding, "a Commerce determination (1) is 'accurate' if it is correct as a mathematical and factual matter, thus supported by substantial evidence; and (2) reflects 'commercial reality' if it is consistent with the method provided in the statute, thus in accordance with law." Nan Ya, 2016 WL 209915, at *7 (citations omitted); see Fine Furniture, 748 F.3d at 1373 ("[19 U.S.C. § 1677e(b)] authorize[es] Commerce to provide a reasonable estimate based on the best facts available, accompanied by a reasonable adverse inference used in place of missing information . . . .").

[63] See Nan Ya, 2016 WL 209915, at *7.

[64] Fine Furniture, 748 F.3d at 1372 (citing KYD, Inc. v. United States, 607 F.3d 760, 768 (Fed. Cir. 2010)).

potential to encourage the [GOC] to cooperate so as not to hurt its overall industry."[65]

Further, Commerce's determination is supported by substantial evidence because it is based on a reasonable reading of the record evidence.[66] Commerce selected the "highest, non-specific electricity rates for the appropriate user categories" on the record, that is, actual electricity rates, as provided by the GOC, charged to users comparable to respondents during the relevant time period.[67]

Contrary to Plaintiff's arguments,[68] Commerce reasonably declined to use the chlor-akali subset of large

---

[65] _Fine Furniture_, 748 F.3d at 1373.

[66] See _Nan Ya_, 2016 WL 209915, at *7; _Nippon Steel_, 458 F.3d at 1351.

[67] See _Final I&D Mem._, _supra_ note 1, at 30; _Prelim. Benchmark Mem._, ECF No. 30-1 at Tab 4, at 1, attach. 1 (electricity benchmark table); _Zhejiang Electricity Schedule_, ECF No. 30-1 at Tab 2 at Ex. E2-3.

[68] Plaintiff argues that because it is "in the chlor-alkali business," Pl.'s Br., ECF No. 25-2, at 12, and because "Commerce has made no finding that the chlor-alkali rates in the Zhejiang . . . schedule constitute a countervailable subsidy or that they provide a specific benefit to an industry or a group of industries under 19 U.S.C. § 1677(5A)," Pl.'s Reply, ECF No. 36, at 14, there is "no basis to disqualify the Zhejiang chlor[-]alkali electricity rates as benchmarks for Jiheng's consumption of electricity," _id._, and Commerce must, therefore, use them as the benchmarks in its benefit calculation, Pl.'s Br., ECF No. 25-2, at 14; Pl.'s Reply, ECF No. 36, at 16.  But Commerce is under no such obligation. 19 U.S.C. § 1677e(b)(4) (Commerce may use "any . . . information placed on the record."); see _Nan Ya_, 2016 WL 209915, at *8-11.

industry rates from Zhejiang, despite Plaintiff's status as a
chlor-alkali "producer,"[69] because "the GOC's refusal to respond
to [Commerce's] questions" regarding the GOC's electricity
pricing practices "rendered the provincial electricity rates
unreliable."[70]  Commerce found that the chlor-akali rates were "a
preferential electricity rate specific to [the chlor-alkali]
industry," making its selection inconsistent with adverse
inferences.[71]  Accordingly, Commerce used the Zhejiang large
industry rates as a "reasonably accurate estimate of
[Plaintiff's] actual [electricity] rate[s], albeit with some
built-in increase intended as a deterrent to [the GOC] for

---

[69] See Pl.'s Br., ECF No. 25-2, at 12.

[70] Final I&D Mem., *supra* note 1, at 31.

[71] Id. at 32.  Plaintiff itself concedes that the rate is
"preferential." Pl.'s Br., ECF No. 25-2, at 12 (noting that, on
the Southern Hebei Electricity Schedule, its rate is translated
as "preferential" (citing Jiheng Electricity Template, ECF Nos.
26 & 27 at Tab 3, at app. 26), and that the chlor-alkali rates
on the Zhejiang Electricity Schedule are "the same or
comparable"); see also Pl.'s Reply, ECF No. 36, at 14-16.
Plaintiff tries to argue that this preference is the result of
"well-established market principles," Pl.'s Reply, ECF No. 36,
at 15.  This argument is unconvincing because Plaintiff can
marshal no more support for it than "perhaps the most overused
phrase in retail, 'the more you buy, the more you save.'" Id.
Further, Plaintiff provides, by its own submission on the
record, that the chlor-alkali process is not a distinct
industry, but an electricity-intensive step in the production of
chloro isocyanurates (SDIC and TCCA) (i.e., implicating both the
subsidized good and industry at issue here). See Jiheng Section
III Resp., ECF Nos. 26 & 27 at Tab 3, at app. 3 (providing an
outline of the chlor-akali stage in the production of
chlorinated isocyanurates).

noncompliance."[72]  Such an adverse inference is supported by

substantial evidence.[73]

**CONCLUSION**

For these reasons, Commerce's determination in

Chlorinated Isocyanurates from the [PRC], 79 Fed. Reg. 56,560

(Dep't Commerce Sept. 22, 2014) (final affirmative

countervailing duty determination; 2012) is supported by

substantial evidence and in accordance with law, and is

therefore AFFIRMED.  Judgment will be issued accordingly.


                                    /s/Donald C. Pogue
                                    Donald C. Pogue, Senior Judge

Dated: February 18, 2016
       New York, NY

---

[72] See Mueller Comercial, 753 F.3d at 1234 (quoting F.lli De
Cecco, 216 F.3d at 1032); Fine Furniture, 748 F.3d at 1373.

[73] See Fine Furniture, 748 F.3d at 1373.